UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

EXXON MOBIL CORPORATION, a New
Jersey corporation,

        Plaintiff,

        v.

FREEMAN HOLDINGS OF WASHINGTON,
LLC, a Washington Limited
Liability Company, d/b/a Million
Air-Moses Lake, and FRANCIS B.
FREEMAN, JR.,

        Defendants.

NO. CV-09-0390-EFS

**ORDER RULING ON DISPOSITIVE
MOTIONS HEARD MARCH 1,
2011, and REQUIRING PARTIES
TO MEDIATE REMAINING CLAIMS**

A hearing occurred in the above-captioned matter on March 1, 2011.
Plaintiff Exxon Mobil Corporation ("Exxon") was represented by Guy
Michelson. Vincent Booth and Harold Moberg appeared on Defendants
Freeman Holdings of Washington, LLC ("FHW") and Francis B. "Chris"
Freeman, Jr.'s behalf. Before the Court were several dispositive
motions: 1) Mr. Freeman's Motion for Summary Judgment (ECF No. 113), 2)
FHW's Motion for Partial Summary Judgment (ECF No. 117), 3) Exxon's
Motion for Summary Judgment on Defendants' Counterclaims (ECF No. 121),
and 4) Exxon's Motion for Partial Summary Judgment for Conversion (ECF
No. 125). After reviewing the submitted material[1] and relevant authority

---

[1] The Court also reviewed the praecipe (ECF No. 229) filed by

ORDER ~ 1

and hearing from counsel, the Court is fully informed.  This Order supplements and memorializes the Court's oral rulings.  For the reasons given below, Mr. Freeman's summary judgment motion is denied, FHW's Motion for Partial Summary Judgment is denied and denied as moot in part, Exxon's "counterclaim" summary-judgment motion is granted, and Exxon's "conversion" summary-judgment motion is granted and denied in part.

**A.   Factual Statement[2]**

    1.   <u>Exxon's History at the Airport</u>

    Since the 1960s, Exxon supplied aviation fuel to customers at the Grant County International Airport in Moses Lake ("Airport"), leasing two above ground storage tanks (Tanks 24 and 38) and related hydrant facilities from the Port of Moses Lake ("Port").  Tanks 24's and 38's storage capacity is approximately 1.1 million gallons and 2.2 million gallons, respectively.  Exxon contracted with a ground agent, Air America Fuel & Services, Inc. ("Air America").  Air America, which was owned by

---

Defendants on March 1, 2011, as well as Exxon's response (ECF No. 236).

    [2]  When considering these motions and creating this factual section, the Court did not weigh the evidence or assess credibility; instead, the Court believed the undisputed facts (ECF No. 177) and the opposing party's evidence and drew all justifiable inferences therefrom in its favor.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).  However, the Court did not accept as true assertions made by the opposing party if they were flatly contradicted by the record.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  Disputed facts are supported by a citation to the record, while undisputed facts are not.

ORDER ~ 2

Larry Godden, stored, handled, and delivered Exxon's fuel to customers.

In mid-2008, Exxon decided to terminate its lease with the Port effective December 31, 2008, for a number of reasons, including that the storage tanks required Exxon to carry a large fuel inventory in order to effectively pump fuel. Due to the tanks' inefficiency, Exxon believed that the tanks would be decommissioned after December 31, 2008. On September 25, 2008, Exxon notified the Port of its decision to terminate its lease at the Airport effective December 31, 2008. On October 13, 2008, this notice was approved by the Port's Board of Commissioners.

2. <u>Tanks and Fuel Handling</u>

In a November 20, 2008 letter to Martin Tippl of Exxon, Port Executive Manager Craig Baldwin advised that the Port wanted Exxon to clean and inspect Tanks 24 and 38. Mr. Baldwin further stated, "in considering the lease will be terminated on December 31 of this year, we believe that time is of the essence." The letter also announced that the Port intended to lease Tanks 24 and 38 to FHW; thereby making it clear that these tanks would not be decommissioned by the Port as Exxon previously thought. (ECF No. 127-3 at 36.)

Exxon was aware that its agreement with the Port required it to clean and repair, normal wear and tear excepted, Tanks 24 and 38 at the termination of its lease. Once Tank 24 was cleaned and repaired, Exxon planned to transfer the fuel in Tank 38 to Tank 24, and Tank 38 would be inspected, cleaned, and repaired. However, Exxon neither requested nor received permission from the Port to occupy Tanks 24 or 38 after December 31, 2008.

ORDER ~ 3

Exxon hired Mr. Godden as its local agent to supervise the tank cleaning and repair of both the tanks. Mr. Godden was aware that Exxon planned to sell or remove the fuel from Tank 38, and preferably to FHW. Exxon's preference was to sell the fuel to FHW because, in order to remove all of its fuel, the Airport's hydrant system would have to be shut down, thereby interrupting fuel service at the Airport.

On December 15, 2008, Mr. Tippl asked Mr. Godden to provide the name of the FHW representative who handled the fuel purchase. Mr. Godden initially responded that he would forward the purchase-related documents to "the appropriate party at Freeman Holdings for review and consideration," but later that same day, Mr. Godden reported: "I have been informed that someone from AVFuel will be contacting you or your designee for this transaction . . . . For any further discussion pertaining to the sale of fuel at transition, the primary contact for AVFuel is Mark Haynes. . . ." Exxon representative Debbie Hart attempted to reach Mr. Haynes through her contact at AVFuel without success.

On or around December 17, 2008, Exxon initiated its tank-cleaning plan. Jeffrey Koehn of Exxon traveled to Moses Lake to supervise the fuel's removal from Tank 24 (approximately 35,000 gallons). On December 30, 2008, a third party, Saybolt, measured the fuel volume in Tank 38 and the hydrant system. The Saybolt inventory identified a total of 403,579 gallons of fuel: approximately 345,000 gallons in Tank 38 and 56,000 gallons in the hydrant system. Mr. Godden immediately forwarded the Saybolt report to Mr. Freeman. On December 31, 2008, Debbie Hart was informed that AVFuel would not purchase the fuel in Tank 38 and thus Exxon should deal directly with Mr. Freeman on this issue. Mr. Freeman had previously engaged in similar fuel purchases after purchasing a fixed

ORDER ~ 4

base operation (FBO) where a predecessor's fuels remained in the tanks when his business started operations.

On January 1, 2009, Exxon's 403,579 gallons of fuel remained in Tank 38 and the hydrant system. Exxon did not request or receive permission from the Port of Moses Lake to possess, use, or occupy Tanks 24 or 38 after the termination of Exxon's lease on December 31, 2008. Neither FHW nor Mr. Freeman contacted Exxon prior to December 31, 2008, to demand that Exxon remove its fuel from Tanks 24 and 38 by that time; and Mr. Godden testified that he understood that the tank-cleaning process would continue into 2009. (ECF No. 127-2: Godden Dep. at 96-97.)

3. <u>Post-January 1, 2009 Events</u>

On January 7, 2009, Mr. Abugel, a fuel "exchange negotiator," sent an email to Ms. Hart stating, "From a supply perspective, there are no takers to do an in-tank sale to any of my usual trading partners." The next day, Mr. Abugel contacted Mr. Freeman to negotiate the potential sale terms. Mr. Freeman, negotiating on FHW's behalf, offered to pay $225,390 for the remaining fuel. Negotiations broke down when Mr. Freeman insisted that he would only pay $1.36 per gallon for half of the remaining fuel. Exxon believed that this price was well below market price and refused the offer.

On January 10, 2009, Exxon contacted Mr. Godden to inquire about the status of a possible fuel sale to FHW. Exxon reaffirmed that if no sale was reached, Exxon intended to remove its fuel from the Airport. On January 23, 2009, Exxon requested that Mr. Godden confirm the amount of Exxon's fuel at the Airport, and Mr. Godden confirmed the Saybolt report figure. On January 26, 2009, Mr. Abugel sent a letter to Mr. Freeman

outlining three proposals for resolving the fuel situation: 1) allow Exxon to remove its fuel from Tank 38 and the hydrant system; 2) compensate Exxon with in-kind product at Moses Lake; or 3) compensate Exxon with in-kind product at another terminal.  On January 28 and 30, 2009, Mr. Godden again acknowledged Exxon's fuel inventory.  And on January 28, 2009, Mr. Godden confirmed that he would not pump Exxon's fuel in Tank 38 contrary to Exxon's instructions.[3]  On February 2, 2009, Mr. Freeman rejected Mr. Abugel's three options and threatened criminal prosecution for trespass if Exxon attempted to recover its fuel.

By February 17, 2009, FHW pumped, sold, or otherwise disposed of 358,174.78 gallons of Exxon's fuel from Tank 38.  Exxon has not been compensated for its fuel.  On its 2009 financial records, FHW listed the amount it received from AVFuels for this sold fuel, $721,316.75, as an "accrued expense" or "current liability."[4]  (ECF No. 200-1 at 7-8, 22-25, & 47; ECF No. 227 at 11, 38.)

By late March 2009, Tank 24 was completely inspected, cleaned, and repaired.  Most of the fuel in Tank 38 was then transferred to Tank 24 (approximately 200,000 gallons).  But FHW allowed Exxon to remove the

---

[3]  Mr. Godden testified, "It was standard operating procedure that any time we went below four feet, that we needed the fuel supplier's authorization.  It's their product.  They control how it's delivered."

[4]  The Court understands that FHW obtained $721,316.75 as the payment from AVFuels; however, Mr. Balestrieri's February 23, 2011 affidavit suggests the amount received may have been $640.888.40.  (ECF No. 229, Ex. A ¶ 12.)

ORDER ~ 6

remaining approximately 41,000 gallons of fuel in the bottom few inches of Tank 38 in April 2009;[5] Exxon trucked and sold this fuel to Montana Refinery Company and received $1.54/gallon for the fuel. Exxon then commenced inspecting, cleaning, and repairing Tank 38. This process was complete in late October 2009. The Port never criticized the speed of the tank-cleaning process, which Exxon paid for, including Mr. Godden's twenty-five-percent fee. (ECF No. 173-2: Godden Dep. at 95, ll. 19-23.)

### 4. Mr. Freeman and FHW

In July or August 2008, unbeknownst to Exxon or Western Petroleum,[6] Mr. Freeman began negotiations to acquire the two FBOs, including Air America, at the Airport. Mr. Freeman is the sole owner of "Freeman" limited liability companies through which he owns and operates multiple "Million Air" franchises across the country that provide fuel to customers at airports like Moses Lake. Mr. Freeman owns nine of the twenty-five U.S. Million Air franchises.

On September 19, 2008, before FHW was created, Mr. Freeman entered into an "abbreviated agreement" with Mr. Godden to purchase Air America's assets; Exxon was not a party to this agreement. The agreement contemplated a future formal contract between Mr. Godden and Mr. Freeman, or a "named limited liability company" to be created at a later date; the

---

[5] This was the first time that Mr. Freeman or any Freeman-related entity representative advised Exxon after February 2, 2009, that it could remove its fuel.

[6] Western Petroleum was Exxon's distributor. (ECF No. 118-5: Oldham Dep. at 48, l. 17.)

ORDER ~ 7

formal agreement was entered either on March 9 or 10, 2009.  At the time of the abbreviated agreement in September 2008, Mr. Freeman made the initial $5,000 down payment to purchase Air America's assets from a personal account drawn from a Kansas bank.  On November 14, 2008, Mr. Freeman incorporated FHW, the corporate entity that would own and operate Million Air Moses Lake—the entity which would take over Air America's fueling services at the Airport.  Mr. Freeman is now and has always been the sole owner and manager of FHW.

On December 1, 2008, the Port and FHW executed two contracts: 1) a Lease and 2) a Sublease and Fixed Base Operator Agreement.  Pursuant to the contracts, FHW's lease of the tanks, hydrant system, and other parts of the Airport was to became effective on January 1, 2009.

Mr. Freeman hired Mr. Godden to serve as FHW's General Manager beginning January 1, 2009.  Therefore, from January 2009 to October 2009, Mr. Godden served two roles:  1) FHW's General Manager and 2) Exxon's agent for overseeing tank cleaning and repair.

Although Exxon was cleaning one of the tanks from January to October 2009, FHW did not lose any bona fide business opportunity.[7]  And during the relevant time period, FHW had adequate fuel supply and met its Jet A aviation-fuel customers' needs.  In 2009, FHW operated at an $855,859 deficit, as expected; it is typical for Mr. Freeman's FBO businesses operate at a deficit when they commence operations at a new location. (ECF No. 226 at 9.)   Part of the deficit included the following

_____

[7]  FHW has a petty cash account in Moses Lake and bank accounts at Stanley Bank in Stanley, Kansas.

ORDER ~ 8

consideration-free transfers: $210,000 that Mr. Freeman drew out of the FHW account to himself, $20,000 to another Freeman Holdings, LLC, and $3,560 to Freeman New York. (ECF No. 200-1 at 36-37 & 47; ECF No. 226 at 8; ECF No. 227 at 77; ECF No. 205, Ex. B.)

About six years of FHW's ten-year lease with the Port of Moses Lake remains; FHW has an option to extend the lease for an additional ten years. (ECF No. 229, Ex. A. ¶ 15.) Two of FHW's customers are the U.S. Air Force and Boeing. *Id.* ¶ 13. FHW has a four-year contract with the Department of Defense to provide fuel to military aircraft at the Airport.[8] *Id.* ¶ 16. The Air Force is expected to continue to relocate its Fairchild Air Force Base operations from Spokane to the Airport until at least November 2011. *Id.* ¶ 17. As a result of the increased Air Force fueling operations, FHW expects its gross revenue for 2011 to exceed 18 million dollars. *Id.* ¶ 18. Since operating at the Airport, FHW has paid its not-at-issue debts, when due. *Id* ¶ 19. Currently, FHW's assets, which primarily include non-judgment-recoverable assets such as upgrades to leased facilities, organizational costs, and goodwill, exceeds its liabilities. (ECF No. 226 at 8; ECF No. 229 ¶ 10.)

5.  Lawsuit

On December 29, 2009, Exxon filed this lawsuit, seeking recovery for its fuel and a declaratory judgment. (ECF No. 1.) The Court has dismissed Freeman Holdings of Kansas, resolved a number of discovery issues, and denied Mr. Freeman's motion to dismiss. (ECF No. 24, 60, 85,

///

---

[8]  The dates of this four-year contract is unknown by the Court.

ORDER ~ 9

86, 132, 138, 158, 159, 168, & 181.)   The Court now resolves the four pending dispositive motions.

**B.   Standard**

Summary judgment is appropriate if the record establishes "no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party opposing summary judgment must point to specific facts establishing a genuine issue of material fact for trial.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986).  If the nonmoving party fails to make such a showing for any of the elements essential to its case for which it bears the burden of proof, the trial court should grant the summary judgment motion.  *Celotex Corp.,* 477 U.S. at 322.

**C.   Mr. Freeman's Motion for Summary Judgment**

Mr. Freeman asks the Court to enter summary judgment in his favor on Exxon's alter-ego claims contending that Exxon failed to present evidence to support the necessary elements, namely that there is no evidence that Mr. Freeman deliberately intended to use the corporate form to avoid a duty owed to Exxon, or that disregarding the corporate form is necessary to prevent an unjustified loss to Exxon. Exxon contends triable issues of material fact exist.[9]

---

[9]   Exxon alternatively sought leave under Federal Rule of Civil Procedure 56(d) to conduct additional discovery relating to its alter-ego liability claim.  Since Exxon filed its response, Exxon was given leave to conduct such discovery.  (ECF No. 181.)  Accordingly, the Court **denies**

The parties disagreed as to the corporate-veil-piercing standards. The Court resolved this issue in its February 10, 2011 Order Denying Defendant Freeman's Motion to Dismiss Pursuant to Rule 12(b)(6) (ECF No. 181).  The Court determined the following two elements must be proven before the equitable remedy of corporate-veil piercing applies:  1) the corporate form is used to violate or evade a legal obligation, and 2) corporate-veil piercing is necessary to prevent a loss to an innocent party.  *See Chadwick Farms Owners Ass'n v. FHC, LLC*, 166 Wn.2d 178, 200 (2009); *Meisel v. M & N Modern Hydraulic Press Co.*, 97 Wn.2d 403, 410-11 (1982); *Washington v. Davies*, 176 Wash. 100, 114 (1934).

The first element (evasion of a legal obligation) requires "an abuse of corporate form" to the abuser's benefit and to the innocent party's detriment.  *Meisel*, 97 Wn.2d at 410.  Here, Exxon contends that Defendants will utilize FHW's corporate form to its advantage by shifting FHW's financial assets to either Mr. Freeman individually or to his other solely-held and controlled FBOs, thereby making it difficult or impossible for Exxon to satisfy any judgment that may be imposed in this action.

The Court recognizes that an individual may legitimately form a corporation to reduce liability exposure,[10] *see id.*; RCW 25.15.050 (1)(a),

_____

this request **as moot**.

[10]  In regards to a limited liability company, the Washington legislature has recognized:

> Members of a limited liability company shall be personally liable for any act, debt, obligation, or liability of the limited liability company to the extent that shareholders of a Washington business corporation would be liable in analogous

ORDER ~ 11

and that FHW's anticipated income stream is sufficient to satisfy any likely judgment in this case. However, there is no evidence as to where Boeing's and the U.S. Air Force's payments go, i.e., whether they are deposited into a FHW bank account, another Freeman Holding bank account, or a bank account in Mr. Freeman's name. And even if it is deposited into a FHW bank account, there is concern given the consideration-free financial transfers that have occurred that Exxon would be unable to serve a writ of garnishment on the FHW bank account at the precise necessary time before the money was transferred out in a consideration-free transfer. Accordingly, absent FHW stipulating that Exxon may garnish FHW's future income stream from either Boeing or the U.S. Air Force in an amount sufficient to satisfy any potential judgment, the Court determines that the trier of fact should consider whether Defendants, given the consideration-free draws, abused the corporate form to their benefit and to Exxon's detriment.[11] *See Minton v. Ralston Purina*

> circumstances. In this regard, the court may consider the factors and policies set forth in established case law with regard to piercing the corporate veil, except that the failure to hold meetings of members or managers or the failure to observe formalities pertaining to the calling or conduct of meetings shall not be considered a factor tending to establish that the members have personal liability for any act, debt, obligation, or liability of the limited liability company if the certificate of formation and limited liability company agreement do not expressly require the holding of meetings of members or managers.

RCW 25.15.060.

[11] Exxon presents evidence of Mr. Freemen's thirty-five year old criminal conviction and other civil lawsuits. At this time, the Court agrees with Defendants that this conviction and other lawsuits are

ORDER ~ 12

*Co.*, 146 Wn.2d 385, 398 (2002) (manipulating the entities in order to avoid a legal duty); *Truckweld Equip. Co., Inc. v. Olson*, 26 Wn. App. 638, 645 (1980) (discussing that fraudulent intent may be manifested if a corporation is extremely thinly capitalized); *Garvin v. Matthews*, 193 Wash. 152, 156-57 (1938) (piercing the corporate veil if an innocent party is harmed by an individual using a corporation merely as an instrumentality to conduct personal business); *Davies*, 176 Wash. at 113-14 ("[W]here a private person so dominates and controls a corporation that such corporation is his alter ego . . . ."); Thomas V. Harris, *Washington's Doctrine of Corporate Disregard*, 56 Wash. L. Rev. 253, 258 (March 1981) ("[T]here is such a commingling of property rights or interests as to render it apparent that the corporation and some other entity were intended to function as one.").

Likewise, triable issues of fact exist as to the second element, i.e., whether corporate-veil piercing is necessary to prevent a loss to an innocent party. This element focuses on whether the innocent party was harmed by the alter-ego conduct, fraud, bad faith, or other legal-responsibility-evading conduct. *Meisel*, 97 Wn.2d at 410; *Morgan*, 93 Wn.2d at 587. Exxon has not received any financial remuneration for the 358,174.78 gallons that FHW pumped, sold, or otherwise disposed. If FHW freely transfers money and assets to Mr. Freeman or other Freeman FBOs without any consideration, Exxon's ability to satisfy any potential could be harmed by Defendants' alter-ego conduct.

///

irrelevant to whether FHW is Mr. Freeman's alter ego.

The Court recognizes corporate-veil piercing is an equitable remedy imposed only in exceptional circumstances. *Eagle Pac. Ins. Co. v. Christenen*, 85 Wn. App. 695, 707-08 (1997). However, the application of this equitable remedy should be resolved at trial absent a stipulation by FHW ensuring that Defendants can satisfy any potential judgment through an appropriate garnishment. Accordingly, Defendant Freeman's motion is **denied.**

**D.   Summary Judgment Motions Relating to Conversion**

Defendants[12] asks the Court to enter summary judgment in their favor as to Exxon's declaratory judgment and conversion claims because Exxon had no right to possess the fuel tanks after December 31, 2008, and therefore by its conduct it abandoned the fuel. In response, Exxon withdraws its declaratory-judgment claim,[13] but opposes Defendants' motion as it relates to the conversion claim. Furthermore, Exxon filed its own motion asking the Court to enter summary judgment in its favor on its conversion claim.

A plaintiff establishes conversion if 1) he was entitled to possess the chattel, 2) he was deprived of such possession, 3) due to the

---

[12]   Only FHW filed this motion because Mr. Freeman did not understand that the Amended Complaint asserted a conversion claim against him. Because the Court finds that the Amended Complaint asserts such a claim against Mr. Freeman individually, and did so with the Court's permission (ECF No. 60), the Court construes this motion as also being brought by Mr. Freeman.

[13]   Accordingly, Defendants' motion is **denied as moot in part.**

ORDER ~ 14

defendant's wilful interference, and 4) such interference was not justified. *PUD of Lewis Cnty. v. WPPSS*, 104 Wn.2d 353, 378 (1985) ("A conversion is the act of willfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived of the possession of it."); 29 Wash. Prac., Elements of an Action § 7.1.

Defendants contend that Exxon cannot establish the first, third, or fourth elements. As to the first "possession" element, Defendants contend that Exxon deprived itself of fuel possession when it left the fuel in the tanks after its leasehold interest ceased on December 31, 2008. The Court disagrees.

The Washington Supreme Court in *In re Marriage of Langham* discussed the two "possession" approaches: an archaic approach and a modern approach. 153 Wn.2d 553, 565 (2005). The archaic-possession approach requires the plaintiff to establish either possession or the immediate right to possess the chattel; the modern-possession approach requires the plaintiff to establish only "some property interest in the goods allegedly converted." *Id.* The Washington Supreme Court did not expressly adopt one approach but did apply the modern approach. *Id.* The Court finds it need not adopt a specific approach because, under either approach, Exxon continued to hold title to the fuel after December 31, 2008. Clearly, after December 31, 2008, Exxon did not have an express contractual right to use the *fuel tanks*. But FHW's contracts with the Port did not extinguish Exxon's *title to the fuel* contained therein, especially since the Port expected Exxon to inspect, clean, and repair the tanks. All entities—the Port, FHW, and Exxon—understood that the ///

ORDER ~ 15

tank-cleaning process would take months and therefore that Exxon would maintain a presence at the Airport after December 31, 2008.

The circumstances here are distinguished from *Kruger v. Horton*, a case relied on by Defendants. In *Kruger*, the seller of land could not recover under conversion for the value of timber harvested by the buyer before defaulting on the loan. 106 Wn.2d 738 (1986). A buyer of land has the right to possess the land, including growing and harvesting crops and timber thereon. *Id.* at 744. Here, at all relevant times, the land, and fuel tanks and equipment thereon, have been owned by the Port. It was the right to utilize a portion of the Airport, specifically the fuel tanks and equipment, that changed from Exxon to FHW on December 31, 2008. FHW's contractual right to utilize the fuel tanks and equipment beginning on January 1, 2009, did not include gaining the title to Exxon's remaining fuel.[14] Accordingly, the Court determines that no triable issue of fact exists: Exxon was entitled to possess the remaining fuel.

///

---

[14] Even if the determination of whether Exxon's title to the remaining fuel was questionable, possession to the rightful owner could only be denied for the time reasonably necessary to make this determination. *See Olin v. Goehler*, 39 Wn. App. 688 (1985) ("Assuming there had been a valid dispute or conflicting claims to the personal property, possession could have been denied . . . only for so long as reasonably necessary to determine the identity of the rightful claimant."). FHW's continued retention of all profits derived from the fuel is not reasonable.

ORDER ~ 16

Defendant also argues that Exxon, not Defendants, deprived itself of fuel possession and therefore Plaintiff cannot satisfy the second element. This argument raises abandonment-type issues. Although a jury may determine that Exxon was slow at addressing what to do with the fuel remaining in the tanks on December 31, 2008, all evidence shows that Exxon did not intend to relinquish its title to the remaining fuel. On or before December 31, 2008, Exxon had contacted both Mr. Freeman and Mr. Gooden and advised them of its desire to measure the remaining fuel. Also, Exxon discussed with Mr. Godden the possibility of FHW purchasing the fuel. After December 31, 2008, Exxon continued to discuss possible methods to recover the fuel or its value.   Accordingly, Exxon did not abandon its title to the fuel and did not deprive itself of the right to possess the fuel. *See Shew v. Coon Bay Loafers, Inc.*, 76 Wn.2d 40, 50 (1969) (setting forth abandonment standards); see also *Smith v. Favila*, 23 Wn. App. 59 (1979) (finding insufficient evidence to indicate that the plaintiffs abandoned their personal property).   Therefore, Exxon satisfies the second element.

And because FHW has continued to retain the profits from the sale of Exxon's fuel, the Court finds Exxon satisfies the "wilful" portion of the third element.   Yet, the jury must assess whether Exxon was deprived of its fuel (or equivalent) *because of* Defendant(s)' wilful conduct, i.e., the causation portion of the third element. Reasonable minds could differ on whether Exxon should have been more proactive in ensuring that 1) it had removed its fuel on or before December 31, 2008, 2) it had a buyer to remove the fuel on or before December 31, 2008, or 3) FHW would purchase the fuel.

ORDER ~ 17

If the jury finds that Defendants' wilful interference caused Exxon to be deprived of its fuel, then the Court finds it is clear that Defendant(s)' interference was not justified.  There is no evidence to explain why Defendants were unable to provide Exxon with the money that Defendants received for the fuel sold, which was sold by March 2009, within a reasonable time period.  And Defendants' goodwill is irrelevant to conversion.  *See Clapp v. Johnson*, 186 Wash. 327, 330 (1936) ("[G]ood faith on the part of the defendant, in an action, cannot be shown as a matter of defense.").  Likewise, Defendants' business-necessity defense, if one can be asserted against a conversion claim, fails because there is no evidence that Defendants were unable to add additional fuel to Tank 38 or forward the financial-remuneration received for Exxon's fuel upon receipt to Exxon.  Accordingly, Exxon satisfies the last element as well.[15]

///

---

[15]  Triable issues of fact exist as to whether Mr. Freeman is individually liable for conversion given that Mr. Freeman was the individual responsible for deciding to retain the fuel and not pay Exxon when the fuel was sold.  *See* RCW 25.15.125(2) ("A member or manager of a limited liability company is personally liable for his or her own torts."); *Montclair v. United Soccer Club v. Count Me In Corp.*, Case No. C08-1642, 2010 WL 2376229, *4 (W.D. Wash. June 9, 2010) (recognizing that a corporate officer can be liable for conversion if 1) the company converted the plaintiff's chattel, and 2) the officer knowingly participated in or approved the company's conduct).

ORDER ~ 18

Finally, if the jury finds causation (third element) in Exxon's favor, the jury should consider each party's conduct when assessing damages. Although Exxon's right to possess the fuel remained after December 31, 2008, the jury may determine that Exxon's damages were caused in part by its own delay.

In sum, Defendants' motion is **denied as moot** (declaratory judgment) **and denied** (remainder) **in part**; and Exxon's motion is **granted** (first, second, fourth, and part of third (wilful) elements) **and denied** (part of third ("due to"/causation) element and damages) **in part**.

**E.   Exxon's Motion for Summary Judgment on Defendants' Counterclaims**

Exxon seeks summary judgment in its favor on Defendants' counterclaims for trespass and unjust enrichment because 1) Exxon owes no independent tort duty to Defendants, 2) Defendants have not been actually or substantially damaged by Exxon's remaining fuel, and 3) Defendants' own conduct does not allow it to recover under unjust enrichment.  Defendants oppose the motion.

1.   <u>Independent-Duty Doctrine</u>

Exxon submits that a tort recovery is barred if the alleged misconduct does not implicate a tort duty that arises independently of the contractual terms. *Eastwood v. Horse Harbor Found., Inc.*, 170 Wn.2d 380 (2010) (clarifying the economic-loss rule or, more appropriately termed, the independent-duty doctrine).  Because the Court finds that Defendants failed to present sufficient evidence to survive summary judgment on both counterclaims, the Court need not address this issue.

///

//

ORDER ~ 19

2.   Trespass

A trespass action lies if an individual intentionally 1) enters the land in possession of another, or causes a thing to do so, 2) remains on the land, or 3) fails to remove from the land a thing which he has a duty to remove.  16 Wash. Prac., Tort Law & Practice § 13.31 (3d ed. 2010).  The individual acts intentionally if he knows that the consequences of the act are substantially certain; he need not intend harm.  *Bradley v. Am. Smelting & Refining Co.*, 104 Wn.2d 677, 682 (1985).   To obtain relief, the claimant must have suffered resulting damage or the trespass must be ongoing.  *Id.*

The Court finds triable issues of fact exist as to whether Exxon trespassed.   Exxon's leasehold interest at the Airport expired on December 31, 2009.  Yet, the Port and FHW were aware that Exxon needed to inspect, clean, and repair the tanks after December 31, 2009.  (ECF No. 127-3 at 36.)  And the Port did not object to Exxon's post-January 2009 tank-cleaning efforts.  Further, the Port, Exxon, and Mr. Godden were aware that removing the fuel from Tank 38 and the hydrant system while Tank 24 was being cleaning would have shut down fueling operations at the Airport.  Accordingly, a triable issue of fact exists as to whether Exxon's decision to keep its fuel in Tank 38 and the hydrant system after December 31, 2008, constituted a trespass.

Yet, this question of fact is largely academic, because FHW fails to establish that it was actually or substantially damaged by Exxon's trespass.  *See id.* at 692 ("Since this is an element of the [trespass] action, the plaintiff who cannot show that actual and substantial damages have been suffered should be subject to dismissal of his cause upon a

motion for summary judgment."). There is no evidence that FHW lost customers, was unable to service customers or sell fuel, or otherwise actually damaged by Exxon's retention of fuel in Tank 38 and the hydrant system or its cleaning of Tank 24, Tank 38, and the hydrant system. Although FHW paid its full rental payment to the Port, there is no evidence that its ability to financially profit from its leasehold interest at the Airport was negatively impacted; in fact, the opposite is true: it has retained the financial benefit received from selling Exxon's fuel. Accordingly, Defendants failed to present sufficient damages evidence to survive summary judgment. And because the fuel has been removed either by FHW's sale of the fuel or by Exxon during the cleaning process, there is no need to enter an injunction. *See Hedlund v. White*, 67 Wn. App. 409, 418 (1992) (finding injunction appropriate for an ongoing trespass). Therefore, the Court grants Exxon's motion and enters summary judgment in its favor on the trespass counterclaim.

3.  Unjust Enrichment

Exxon submits that it is entitled to judgment on FHW's unjust-enrichment counterclaim. The Court agrees.

To establish unjust enrichment, FHW must prove 1) Exxon received a benefit, 2) the received benefit was at FHW's expense, and 3) the circumstances make it unjust for Exxon to retain the benefit without payment. *See Young v. Young*, 164 Wn.2d 477, 484 (2008). There is no evidence that Exxon's decision to keep its fuel in Tank 38 and the hydrant facilities or its tank-cleaning activities caused FHW expense. As discussed above, there is no evidence that FHW was unable to service its Airport clients or that it incurred any extra expense due to this

ORDER ~ 21

fuel.  Rather, the evidence is that FHW benefitted from this fuel because it has retained the financial benefit received from the sold fuel for over a year.  Accordingly, Exxon's motion to dismiss the unjust-enrichment counterclaim is **granted.**

**F.    Conclusion**

For the above-given reasons, **IT IS HEREBY ORDERED:**

1.    Mr. Freeman's Motion for Summary Judgment **(ECF No. 113)** is **DENIED.**

2.    FHW's Motion for Partial Summary Judgment **(ECF No. 117)** is **DENIED AS MOOT** (declaratory judgment) **AND DENIED** (remainder) **IN PART.**

3.    Exxon's Motion for Summary Judgment on Defendants' Counterclaims **(ECF No. 121)** is **GRANTED** (trespass and unjust-enrichment counterclaims).

4.    Exxon's Motion for Partial Summary Judgment for Conversion **(ECF No. 125)** is **GRANTED** (first, second, fourth, and part of third (wilful) elements) **AND DENIED** (part of third ("due to"/causation) element and damages) **IN PART.**

5.    The parties are to mediate with Magistrate Judge Hutton.  Both counsel and a speaking agent, who has authority to settle the case, for each party shall appear in person.

///

///

///

//

//

/

6.   If mediation is unsuccessful, the parties shall file either a joint or individual notice no later than **noon of the second day after mediation,** discussing whether and how this Order's rulings impact witness and exhibit lists (and objections thereto), motions in limine, and deposition designations (and  objections thereto).

**IT IS SO ORDERED.**  The District Court Executive is directed to enter this Order and provide a copy to counsel.

**DATED** this   15th   day of March 2011.


                              s/Edward F. Shea
                              EDWARD F. SHEA
                     United States District Judge

Q:\Civil\2009\0390.march.2011.msjs.frm

ORDER ~ 23